UNITED STATES of America, Appellee,

v.

Arthur FERA, Defendant, Appellant.

No. 79-1268.

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1979.

Decided Feb. 28, 1980.

Richard Heller, Boston, Mass., by appointment of the court, for appellant.

James E. O'Neil, Asst. U. S. Atty., Providence, R. I., with whom Paul F. Murray, U. S. Atty., Providence, R. I., was on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and CLARKE,* District Judge.

J. CALVITT CLARKE, District Judge.

This is an appeal by Arthur Fera of his conviction by a jury for dealing in counterfeit Federal currency, in violation of 18

---

* Of the Eastern District of Virginia, sitting by designation.

1. Section 473 provides:

Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more

---

U.S.C. § 473.[1] He contends that his conviction is defective as a result of several errors in the trial. We affirm the judgment.

The Government's case was based largely upon the testimony of Michael Johnston, Frank Searle and Stephen Petro, agents of the United States Secret Service. According to the evidence presented by the Government through these witnesses, Agent Johnston first became acquainted with Fera while conducting an undercover investigation on August 31, 1978, when he was introduced to him by Robert Colannino, a Government informant. Subsequently, Johnston discussed with Fera the possibility of purchasing counterfeit currency, and on September 5, 1978, Johnston phoned Fera to arrange for such a purchase. The two men met that evening at the Cranston Hilton Hotel in Cranston, Rhode Island, to finalize the deal. Fera agreed to supply Johnston with $20,000 in counterfeit $50 notes in exchange for $1000 in genuine currency, plus a percentage of the profits from any resale of the currency by Johnston.

Later that evening, Fera and Johnston again met at the Cranston Hilton to consummate the transaction. At first Fera suggested that Johnston pick up the notes at a locker in a train station. However, when Johnston refused to follow this procedure, Fera departed and returned to the hotel with a bag containing $20,000 in counterfeit currency which he delivered to Johnston. At a prearranged signal, other agents, including Agents Searle and Petro, moved in and arrested Fera.

I.

The first alleged error urged by Fera is the trial court's failure to instruct the jury, as directed by 18 U.S.C. § 3501(a),[2]

---

than $5,000 or imprisoned not more than ten years, or both.

2. Section 3501 provides, in pertinent part:

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any

to give such weight to statements made by Fera after his arrest as the jury felt they deserved under all the circumstances. These statements were presented to the jury through the testimony of Agents Searle and Petro.

Following his arrest, Fera was taken by Agents Petro and Searle to the offices of the Secret Service in downtown Providence. In response to the agents' questions, Fera gave three conflicting accounts of his acquisition of the counterfeit currency. He first told the agents that he found it. Fera then changed his story and told them that he was given the currency by a person whom he did not know. Again, Fera changed his story in response to further questions, and stated that he bought the currency for $2000 and picked it up from a locker in Logan Airport. During this post-arrest questioning, Fera also admitted that he had additional counterfeit currency at his home in Cranston, Rhode Island, and offered to take the agents to his residence and give this currency to them.

Prior to trial, the district court held a hearing on Fera's motion to suppress these post-arrest statements. On the basis of the evidence presented at that hearing, including the testimony of the defendant himself, the district court found that these statements were made voluntarily and without undue coercion by the Government's agents. Fera does not challenge this finding on appeal.

Before permitting the jury to hear testimony regarding these statements, the district court held a second hearing out of the presence of the jury, as required by section 3501(a), in which it again determined that these statements were made voluntarily. Again, the defendant does not now challenge this finding. The district court then permitted the jury to hear testimony regarding Fera's post-arrest statements. At the same time, the court provided Fera with an adequate opportunity to cross-examine the Government's witnesses concerning the circumstances surrounding these statements and to present further evidence to show that they were made involuntarily.

In the evidence presented to the jury, the Government's agents testified that Fera was made aware of his constitutional rights, including his rights to remain silent and to obtain counsel, at the time of his arrest and on at least three other occasions during the evening. Soon after he was arrested, Fera signed a form acknowledging that he had been advised of his rights and that he understood them.[3] However, without further explanation, Fera refused to sign another portion of the form which stated:

## WAIVER

I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any

issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(e) As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

3. This form is substantially the same standard form discussed in *United States v. Christian,* 571 F.2d 64, 66–70 (1st Cir. 1978). It provides:

WARNING AND CONSENT TO SPEAK
WARNING OF RIGHTS
You must understand your rights before we ask you any questions.

You have the right to remain silent.
Anything you say can be used against you in court, or other proceedings.
You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.
If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer.
I have read this statement of my rights and it has been read to me, and I understand what my rights are.

kind has been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

However, at no time did Fera indicate that he wished to contact an attorney. On the contrary, the testimony revealed that Agent Searle specifically asked Fera if he wished to contact an attorney and that Fera declined this invitation. Nor did Fera request to use the telephone which was on the desk in front of him throughout the questioning.

In response to questions by the appellant's counsel, Agent Petro acknowledged that he once told Fera that any cooperation would be reported to the United States Attorney. However, the agents denied that they ever threatened Fera in any way, and testified that he appeared willing to cooperate with them at all times. Fera testified at the suppression hearing that the agents threatened to send him to prison that night if he called an attorney, and that they otherwise intimidated him. The agents specifically denied these claims. Fera did not take the witness stand during the trial.

Regarding the search of Fera's home, the evidence presented to the jury was that Fera offered to take the agents to his home to recover the additional counterfeit currency secreted there. Prior to the search of his home, Fera signed a form authorizing this search and waiving his right to require a search warrant.[4] There was no evidence that the appellant's consent to the search of his home was obtained improperly, or that this search was conducted in anything other than a subdued and cooperative manner.

On appeal, Fera does not directly challenge the voluntariness of his statements, nor the district court's findings on this issue. Instead, he argues that the district court's failure to instruct the jury to give these statements "whatever weight they considered appropriate" was reversible error. We cannot agree with this contention.

■ This Court recently considered this issue in *United States v. Cowden*, 545 F.2d 257 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). In that case, we held that section 3501(a) does not require "a ritual instruction where no identifiable issue of voluntariness" is raised by the evidence presented to the jury. *Id.* at 267. Only if relevant evidence sufficient to raise a genuine factual issue concerning the voluntariness of such statements is presented by the defendant, whether through his own or the Government's witnesses, is the trial court obligated to instruct the jury concerning the weight to be accorded to the defendant's statements.

■ The evidence presented to the jury failed to raise a serious factual issue concerning the voluntariness of Fera's post-arrest statements. The issue was not implicated by evidence of Agent Petro's statement to Fera that any cooperation would be relayed to the United States Attorney. A promise merely to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible. *See United States v. Curtis*, 562 F.2d 1153, 1154 (9th Cir. 1977), *cert. denied*, 439 U.S. 910, 99 S.Ct. 279, 58

---

4. This form stated:

### CONSENT TO SEARCH

I, Arthur V. Fera, have been informed of my constitutional right not to have a search made of the premises and/or automobile mentioned without a search warrant. I have also been informed of my right to refuse to consent to such a search. However, I hereby authorize Special Agents S. J. Petro and Frank Searle, U.S. Secret Service (Titles of Officers or Agents and Names of Agency) to conduct a complete search of the premises and/or automobile at 94 Calaman Road Cranston RI. These (officers or agents) are authorized by me to take from the premises and/or automobile any letters, papers, materials or other property which is contraband or evidence. I understand that this contraband or evidence may be used against me in a court of law.

This written permission is being given by me to the above named persons voluntarily and without threats, duress or promises of any kind. I understand that I may ask for and receive a receipt for all things taken.

L.Ed.2d 256 (1978); *United States v. Springer,* 460 F.2d 1344, 1347 (7th Cir. 1972), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972; *United States v. Frazier,* 434 F.2d 994 (5th Cir. 1970).

■ Moreover, under the circumstances presented at trial, the appellant's refusal to sign a formal waiver of his right to counsel was not sufficient to raise a serious question concerning the voluntariness of his subsequent statements. Out of an abundance of caution, as the record reveals, the agents repeatedly advised Fera of his rights to remain silent and to obtain counsel. His refusal to sign a formal waiver was accompanied by no explanation. Fera orally indicated his willingness to cooperate and declined the agents' invitation to call an attorney. At no time did Fera object to the agents' questions or seek to terminate the interrogation.[5]

The evidence presented to the jury overwhelmingly pointed to the voluntariness of Fera's post-arrest statements. He exhibited no reluctance to cooperate with the Government's agents other than his unexplained refusal to sign the form. His refusal to sign the formal waiver appears to be nothing more than a calculated strategy to gain whatever benefits which may have resulted from cooperation while not foreclosing any option to terminate this cooperation at a later time should it prove convenient. While the appellant was free to use his rights in this manner, his refusal to sign the formal waiver form does not undermine the otherwise overwhelming evidence of the voluntariness of his statements. *See United States v. Davis,* 532 F.2d 22 (7th Cir. 1976); *United States v. Gardner,* 516 F.2d 334 (7th Cir. 1975), *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975); *United States v. McDaniel,* 463 F.2d 129 (5th Cir. 1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973); *United States v. Ellis,* 457 F.2d 1204 (8th Cir. 1972). *Cf. United States v. Cowden supra,* 545 F.2d at 267. *See also United States v. Sauls,* 520 F.2d 568, 570 (4th Cir. 1975), *cert. denied,* 423 U.S. 1021, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975) (failure to give § 3501 instruction not reversible error where evidence of voluntariness was overwhelming).

■ Even if a sufficient issue concerning the voluntariness of the defendant's statements was raised, and we find that it was not, the district court's failure to instruct the jury as to the specific weight to be accorded such statements would not require reversal. Importantly, the appellant's post-arrest statements did not directly concern the offense for which he was indicted, that being the sale, transfer and delivery of $20,-000 in counterfeit currency. They related only to the collateral issues of Fera's source of counterfeit currency and his possession of additional quantities of such currency at his residence. While these statements may have provided some evidence of the appellant's knowledge and intent, this evidence would merely be cumulative of the already overwhelming evidence of Fera's motive in proceeding with the transaction for which he was charged. Thus, we cannot say that there was a reasonable possibility that the evidence complained of might have contributed to the conviction. Such error, if any, was therefore harmless. *See United States v. Harrigan,* 586 F.2d 860, 863 (1st Cir. 1978); *United States v. Christian, supra,* 571 F.2d at 69–70.

Moreover, at an early point in the trial, the district court expressed concern whether an instruction under § 3501 should be given. However, despite an abundant opportunity to do so, the defendant failed to request any specific instruction on this issue. Nor did he object to the lack of such an instruction, which may have been a conscious strategy designed to avoid calling further attention to Fera's statements. The district court generally instructed the jury that they were the sole judges of the

---

**5.** These circumstances distinguish the present case from our decision in *United States v. Christian,* 571 F.2d 64 (1st Cir. 1978), in which the defendant's refusal to sign a waiver form similar to the one in this case was held to bar the introduction at trial of a post-arrest statement where the defendant also stated that he wanted to talk but only after consulting with an attorney.

weight to be given to the testimony of witnesses. This instruction was sufficient under these circumstances to cure any error which might otherwise have resulted. *See United States v. Marvel*, 493 F.2d 15, 16 (5th Cir. 1974); *United States v. Williams*, 484 F.2d 176, 178 (8th Cir. 1973), *cert. denied*, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973).

## II.

■ Fera also appeals from the district court's refusal to instruct the jury concerning the defense of entrapment. He contends that sufficient evidence of entrapment was elicited at trial to require submission of this issue to the jury, and that the district court erred in refusing to do so. We find no merit in this contention.

■ Entrapment occurs when the offense for which the defendant is charged was instigated by law-enforcement officers and the defendant had no previous disposition to commit the offense. Merely affording the defendant the opportunity for commission of the offense does not constitute entrapment. *See United States v. Caron*, 588 F.2d 851 (1st Cir. 1978); *United States v. Russo*, 540 F.2d 1152 (1st Cir. 1976), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976); *Kadis v. United States*, 373 F.2d 370 (1st Cir. 1967). The initial burden of presenting some evidence of entrapment rests with the defendant. *Kadis v. United States, supra*, 373 F.2d at 374. He must show, through the Government's witnesses or otherwise, some indication that he was corrupted by the law-enforcement agents. A factual issue sufficient to require submission to a jury arises only if his evidence amounts to more than a mere scintilla. *Tzimopoulos v. United States*, 554 F.2d 1216 (1st Cir. 1977), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977).

In the present case, there was no evidence of Fera's unreadiness to commit the offense. To the contrary, the evidence indicates that the agents merely afforded him with an opportunity to commit an offense which he was predisposed to commit. Without more, the agents' testimony that they contacted Fera on several occasions, and that a few days passed between the initial contact and the consummation of the transaction provides no evidence of unreadiness. Indeed, the agents also testified that Fera forged ahead with the deal despite Agent Johnston's invitation to withdraw. Nor was he deterred by such obstacles as Johnston's refusal to go to the train station to pick up the money rather than receive it at the Cranston Hilton. To preserve the deal, Fera apparently went to the station himself and returned with the currency.

Although Fera argues that some suggestion of entrapment was provided by a false story used by the agents to induce Fera to sell them the currency, no evidence of any such story was presented to the jury. Agent Johnston specifically denied having used such a story and no other evidence was produced by the defense on this issue. Nor would entrapment result merely from the use of false pretenses by Government agents. Such techniques are an accepted part of undercover police work, unless they are shown to have been excessive or to have overcome reluctance on the part of a defendant. Fera, however, produced no evidence that any such story, even if used, convinced him to enter into a deal which he was otherwise unwilling to pursue.

Since there was not even a scintilla of evidence that Fera was unready to commit the offense, or that the agents' conduct amounted to more than mere solicitation, Fera was not entitled to an instruction on the defense of entrapment. Accordingly, we find no error in the district court's failure to give such an instruction.

■ Nor did the district court err in instructing the jury that it is "sometimes necessary and permissible for the Government to use stratagems, artifices, ruses and undercover agents or investigators who may use assumed names and conceal their true identity and who, in order to discover violators of the Federal criminal laws, present opportunities to violate those laws to those who are predisposed, ready and willing to violate those laws." The district

court gave this instruction in response to the defendant's repeated suggestion to the jury throughout the trial that the Government's conduct in using undercover agents and informers was improper. This instruction is a proper statement of the law, see, e. g., *United States v. Russell,* 411 U.S. 423, 435–36, 93 S.Ct. 1637, 1644–1645, 36 L.Ed.2d 366 (1973); *Lewis v. United States,* 385 U.S. 206, 208–10, 87 S.Ct. 424, 425–427, 17 L.Ed.2d 312 (1966), and was properly given to dispel any doubt which the jury may have had as a result of the defendant's questions. Nor did it suggest that the defendant was to be presumed guilty merely because he was the object of a covert investigation. The district court repeatedly instructed the jury that the defendant was to be presumed innocent until the Government proved the essential elements of the offense beyond a reasonable doubt. Any contrary suggestion which might have been contained in the court's covert-operations instruction, and we find none, would have been adequately cured by these repeated instructions regarding the presumption of innocence.

### III.

■ The appellant's next contention is that the trial court erred in refusing his motion for a continuance until he could secure the appearance of the Government's informant, Robert Colannino, as a defense witness. Colannino, who appears to have known Fera for some time prior to the investigation, introduced Agent Johnston to Fera. Thereafter, Colannino was present at one or two other meetings between Fera and Johnston during which the exchange of counterfeit currency was discussed. However, Colannino was not present during the final stages of these negotiations, nor did he witness or participate in the actual crime.

On the morning of the trial, the district court held a hearing on Fera's motion for a continuance. During the course of that hearing, the appellant's counsel indicated that Colannino had known Fera for some time. However, until early in December

1978, less than a month before trial on January 3, 1979, the appellant had made no effort to interview Colannino nor had he sought any assistance from the Government in locating him and assuring his presence at trial.

On December 15, 1978, the appellant's counsel filed a subpoena to be served on Colannino. The United States Marshal's Office attempted to serve this subpoena at least seven times prior to trial without success. This service was attempted at his best known address, and the only one known to the Government, which was the home of his grandmother or aunt. On January 2d or 3d, just before trial, a bench warrant was issued for Colannino's arrest. However, attempts to enforce this warrant before trial failed. On January 3d or 4th, the Marshal's Office received a call from Colannino and informed him that he was required to appear in court and that a warrant for his arrest had been issued. Colannino stated that he was out of the state at that time and would return to Rhode Island on January 14, 1979.

When asked by the district court to specify what testimony Colannino was expected to give, the appellant's counsel stated only that the witness was material, that he had introduced the appellant to Agent Johnston, and that he had suggested the possibility of a transfer of counterfeit notes. Later, on the appellant's motion for acquittal based on the absence of Colannino, appellants' counsel urged that Colannino could have testified to the efforts used by the Secret Service agents to induce Fera to deal with them. At no time, however, did Fera indicate to the court what specific facts he expected Colannino to supply in support of his defense.

Fera presented no evidence that Colannino's absence was induced by the Government. *See United States v. Makekau,* 429 F.2d 1403 (9th Cir. 1970), *cert. denied,* 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141 (1970). His speculations to this effect are unsupported by the record. There was no evidence that Colannino was subject to the Government's control at any time after September or early October 1978. At no time prior to December 1978 did Fera at-

tempt to locate this witness, despite his knowledge of the informer's identity and of the alleged importance of his testimony. When the Government's assistance was finally sought, diligent efforts were made to produce Colannino. *See United States v. Diaz,* 535 F.2d 130, 134 (1st Cir. 1976).

Importantly, the testimony indicated that Colannino served only as an introductory device and neither witnessed nor otherwise participated in the actual crime on September 5, 1978. Fera offered only general answers to the district court's questions concerning the nature of Colannino's expected testimony. Presumably, any undue efforts on the part of the agents, witnessed by Colannino and relevant to Fera's entrapment defense, would have been within Fera's knowledge. He, therefore, could be expected to suggest to the court the anticipated testimony with some precision. This he failed to do.

The record provides substantial support for the district court's action. The Government appears to have made every reasonable effort to secure Colannino's presence once this help was requested by the appellant. The absence of this witness was not attributable to the Government. Moreover, Fera failed to allege with any specificity the testimony he expected to elicit from the absent witness. *See United States v. Russo,* 540 F.2d 1152, 1155 (1st Cir. 1976), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976); *United States v. Diaz, supra,* 535 F.2d at 135 n. 6; *United States v. Super,* 492 F.2d 319 (2d Cir. 1974), *cert. denied, Burns v. United States,* 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 115 (1976). Despite Colannino's statement that he would return to the state on January 14, the district court was justified in its skepticism in light of the failure of prior attempts to secure his presence. We, therefore, find no error in the district court's refusal to continue the appellant's trial.

## IV.

Similarly, the appellant's other allegations of error are without merit. The record contains substantial evidence, under the standard announced in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d

560 (1979), to support the jury's finding that the notes passed sufficiently resembled genuine currency "to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest." *United States v. Chodor,* 479 F.2d 661, 664 (1st Cir. 1973). That there were some differences between the counterfeit bills and genuine currency sufficient to enable an expert to distinguish between them clearly does not undermine this finding.

Nor was the appellant improperly prejudiced by Agent Johnston's statement that Fera had told him prior to September 5th, that "he had given counterfeit currency to an individual who passed it in New York City." Assuming that this statement was inadmissible, any prejudice which might have resulted from its introduction was cured by the district court's immediate instruction to the jury to disregard this testimony.

*The judgment of the district court is affirmed.*